Thank you, your honors, and may it please the court. My name is Matthew Robinson on behalf of the appellant defendant, Kelvin Williams. Mr. Williams raises four principal claims in his briefs. First is that the court, the district court, aired and denied a motion to suppress evidence seized from his home and safety deposit box. The second is that the court aired and denying his motion to, excuse me, in denying his motion to conduct his own defense. And the third is the court aired in accepting his waiver of his right to a jury trial. And then finally, whether or not the district court aired in failing to dismiss the indictment when material exculpatory evidence was destroyed by the government prior to trial. With respect to the first argument in the suppression issue, as this court is clear, authorities were called to Mr. Williams' residence as a result of a burglary that may or may not have been in progress at that point. I think the evidence was a little bit unclear. However, the police were definitely called to the residence. The issue, however, is not in the entry into the residence, because obviously the entry was warrantless. However, once inside, the police were able to quickly determine that this was more than just a burglary. There were drug, there was drug evidence and other materials that were in plain view almost immediately upon going into the residence. However, shortly after, and the testimony is debatable as to whether when the police believed the residence was clear or not. However, the protected suite lasted not just moments, but long enough to do an entire thorough search of the entire house, including the basement, the upstairs, the first floor, the kitchen, cabinets, moving dressers, opening microwaves. All of these things happen during the guise of a protective suite. Clearly, the police have the authority to go into a residence when it's been burglarized and to make sure they are safe. They have a tough job. However, based on the testimony and the record before us, it was fairly clear that this turned into a drug investigation. And then once the protective suite was over, they didn't leave and then secure warrants to come find the evidence that they had seen in plain view and then to conduct a further search. Instead, they stayed at the residence for a long period while more police came so that they could, in the testimony of the officers, to expand the burglary-slash-drug investigation. You concede that they could look anywhere where a human being could have hidden, correct? Certainly have to concede that. All right. So you mentioned looking in the microwave. Was anything found in the microwave that's suppressible or any other spot like that where a human being couldn't be hiding? Well, there was one place in the basement where there was drugs found in a wall, I guess. According to the officers during the protective sweep, they went down into the basement and they noticed some plastic from a bag protruding out of a hole. And then they pulled that bag and determined that it was probably a controlled substance. In that instance, it's pretty clear that that was located in a space where an individual couldn't be found. But more importantly, I think- On that particular point, was there white powder that was visible to the officers? I can't say whether the officers first noted the white powder in the bag at the same time, but I know that the testimony is they found the bag. He saw a bag protruding. When he pulled the bag from the wall, he found white powder, that it was containing white powder, and he assumed that that was a controlled substance. And it was. Because if there is white powder, obviously, then the plain view exception would still apply, I would think. But even though it's in the wall, I mean, if you see, for example, a gun hanging out from the top of a wall or out of the top of the ceiling or something like that. To be fair, Your Honor, I don't recall if the testimony was exactly he saw the white powder and the plastic bag contemporaneously, or my recollection was he saw a plastic bag, pulled it from the wall, and then noticed that there was a white powdery substance. So what authority do you have that says that the officers can't stay after having seen in plain view incriminating evidence? Well, I would have to bring that up. I believe it's the Webster case. I didn't write it down, but I will address that in my rebuttal. The answer is there is authority that says certainly you have the authority to seize or note what is in plain view. And I think officers did that. What the officer believed was in plain view during his investigation, he loaded into a cardboard box or a shoe box, I think it was, and then put it on top of a stack of tires somewhere in the residence. And then for the later investigating officers to come back and seize once a warrant had been obtained, I think that was appropriate. It's the sweep and the scope of the search that was inappropriate. And it gives rise to not being able to completely believe everything that the officer stated, because a lot of what they stated in terms of how the search went down was refuted either by or contradict, I shouldn't say refuted, was contradicted by some video evidence and then subsequent testimony during the trial. Don't we defer to the district court on those sorts of credibility determinations? I mean, if you're suggesting the officers can't be believed. Well, I'm not saying that's the argument that we're raising. I think that that's part of the it gives rise to a belief or a belief, especially on the defense side, that what else happened here? What else did occur in this case? Now, the court certainly has the ability to make the credibility determinations. I can't say that that doesn't exist. That's the court's job. When looking at this testimony, and this was at a suppression hearing, and then subsequently, there was a bench trial. You know, before you leave this issue, I want to follow up on Judge Grander's question, which is normally when police have found a contraband, they apply for a warrant to search in the places that may contain more contraband. And generally speaking, the officers can stay on the scene to freeze the scene to make sure nobody else comes into the apartment or the house and removes the remaining contraband. Was that at all litigated here? And I guess my second question is, would that particular doctrine apply here? I would say that it doesn't apply here. You're right that the police have a duty, in fact, to secure the premises, certainly to make sure that the evidence that's theirs remains pristine. And I understand the reason why that exists. I think that even waiting outside the residence would have maintained the residence for security purposes. But rather than doing that, they sat around in the living room, watched TV. I'm not sure if they searched anything else or continued to look around the house, but it's just human nature. And that's part of the reason we have these rules in place. If I was an investigating officer, I'd want to start looking for everything once I got in there. I understand why, but I think that's the reason why these rules are in place, so that human nature doesn't take over to the point where the Fourth Amendment's been violated. And I would suggest that that's happened here. But there's no evidence you can point to specifically that was found because they remained too long. There is no evidence that I can specifically point to with exception of the drugs that were found in the basement. I would think that's the most obvious. Even then, though, aren't you looking at inevitable discovery? Well, and that leads to whether or not the inevitable discovery doctrine should apply here. Certainly, this evidence probably would have been inevitably discovered. But I think that doctrine is superseded or at least put in a situation where the officers conduct in It's important that the DVR evidence, and I neglect to point that out, thank you, Your Honor. The DVR evidence was critically important. That evidence was seized, taken from the residence, put in an officer's locker for three or four days before even getting a warrant, and then delivered to the crime lab. And so when you have this type of conduct in the investigation itself, it gives rise to the point where you're saying, look, there's a bad faith conduct on the part of the officers in actually seizing some of this evidence rather than just simply staying in the residence to make sure it was secure. I got to tell you that that issue probably concerns me the most of all of the issues, but maybe not for the reasons you argued in your brief. I think that the destruction of the evidence creates, especially when there's some questions surrounding the search, um, presumably that would have shown, and it did show, the ones that were available did show them rifling through drawers and things like that. And so, but I don't see you making that argument. I don't, I see you making the argument there could have been exculpatory evidence that showed he didn't do the drug deals, et cetera, but not the argument that, that would have shown the search was illegal. Well, it's, it's difficult to make that argument because how can we make it without having the facts there? Certainly the evidence was manipulated. I don't want to say they destroyed the DVR evidence, but a clone copy was eventually given to the defense. Um, but, but it's, it's the chain of custody issue along with the seizure of the DVR. The government said they made everything available on the, on the DVR. Is that false? I'm sorry, Your Honor, say that again. The government represented to the court that they made everything available to the defense that was on the DVR. Well, what we do know is this, it's difficult to, to, I think it's difficult for the government to make that representation just as, as it is difficult for me to make the representation that I know there's something missing from it. Um, what we do know is the copy that was delivered to the defense council was, uh, was not pristine. It was a clone copy and the hash values were different. Now, whether or not every moment of footage on that video was, uh, was, was truly there or not, I can't make that argument. Without council having gone to look at the complete DVR, aren't we in la la land just guessing that, that maybe something's missing? Well, and I think that's part of the problem with the chain of custody. When you roll this all up together, it can, it, it presents a story. There's a search. There's a long lengthy search under the guise of a protective suite. There's evidence that's taken from the residents, including the DVR evidence that's that and viewed right there, by the way, before even having a warrant, I guess it was turned on at that point in the residents. And then once the officer had secured the DVR evidence, he took it to his, his, uh, his locker at the police station where it sat purportedly for several days. Then a warrant was obtained to actually search the DVR evidence at which time it was provided to the forensic lab. And so we're stuck with, um, uh, a problem where there's a protective sweep that appears to be objectively, uh, well, objectively it's questionable whether or not they extended that suite too long to make it into a, a violation of the fourth amendment coupled with, um, evidence seized from the residents. Did the government use any of the DVR evidence in their case in chief? Well, certainly it was played during the entire trial. That was part of the evidence with the officers, uh, kind of narrating what they believe they witnessed going on. And it wasn't just from the burglary. It was evidence of, uh, it was on 24 seven. Uh, and you're saying the DVR was seized prior to the obtaining of the search warrant. That's correct. It was taken from the residents. It was actually in the, in the officer's locker for, I want to at least three days before the search warrant was issued. Well, that was a search warrant for the search of the DVR, correct? That's correct. How about a search warrant for the search of the house? The search warrant for the search of the house was issued previous to that, certainly, but they took it, they took it that day. Was the DVR taken pursuant to that search warrant or was it taken before then? I can't answer that question accurately at this moment. I have to review my notes, your honor. And if that's something I can't figure out by the time we get to rebuttal here, I will make sure I write the court to give you the factual answer. I'll bet the government will address it for us too. Okay. Thank you, your honor. Um, before I, I finished, I just want to touch on, I think what is a very important issue with respect to, uh, the defendant's request to conduct his own defense. Um, real simply put, uh, the, uh, the request, uh, I see my time is, is running out. Actually, I'm going to, why don't you, I'll give you a couple minutes on rebuttal. All right. Thank you, your honor. Um, very simply put, Mr. Williams asked that he represent himself. He was having difficulties with his attorneys. I understand the judge's frustration with Mr. Williams. However, the court's reason for denying him the ability to defend himself, uh, was, was simply not accurate. He was not, he was not trying to delay the proceedings. In light of the fact that he had gone through five lawyers, I believe, isn't it reasonable to conclude that this was for delay? I don't think so. And here's why. He made the request contemporaneously or after also waiving his right to a jury trial. He's not trying to delay anything. He just isn't satisfied with his attorneys and he wanted to present his own defense. Thank you very much, your honor. Thank you, Mr. Robinson. Morning, Ms. Fleming. May it please the court. On behalf of the United States, I'm asking the court to affirm the defendant's convictions and the district court's rulings on the various motions that are at issue on appeal. Just to answer one of your last questions regarding search warrants, there was no search warrant for the defendant's residence. In this case, there were two search warrants. One was for the search of the DVR and one was for a search of a safe deposit box. So on what basis could they take the DVR? On what basis were they allowed to take the DVR? Well, your honor, they discovered the DVR during their, um, protective sweep. It was in plain view. In fact, the officers saw the DVR or they saw the box. But is it facially incriminating? Yes, a variety of reasons. One, the officers had reasonable belief that it would contain evidence of the burglary. And in fact, it did. It would contain... Is that the standard on a plain view? Excuse me, your honor? Is that the correct standard for plain view? Doesn't it have to be plainly incriminating? Well, your honor, I would suggest that it is. As opposed to reasonable probability. I would suggest that it is, your honor, that it meets that standard. Well, your honor, when they were conducting their protective sweep, they observed throughout the house. Obviously, you not only have evidence of a burglary, so you want to preserve that evidence, but also you have copious evidence of drug trafficking. There are drugs and guns and incriminating paperwork throughout the house. And so a DVR that is, in fact, testimony would be, had this been challenged, that that was not, in fact, incriminating. It was not challenged, but had it been challenged, I have no... I think, in fact, the court can infer that a drug trafficker, the reason that they have a surveillance system is to protect their house from being invaded. In fact, this particular defendant admitted to having at least one home invasion. In fact, the testimony was that his house had been robbed twice before in similar manner. Did they know that this was connected to the surveillance system when they did it? Because I mean, for instance, if somebody sees a direct TV DVR, obviously that would not be incriminating. Right, your honor. Yes, they did. Or at least there were wires that were connected from the DVR to cameras in various locations in the house. One in the living room, I believe, and one in the dining room. It also was connected to cameras that were videoing both the outside of the residence, where that camera was actually placed, as it's hard to tell from the video footage, but also the entrance from the inside of the residence. So clearly it was set up two cameras that would have been videoing, in fact, the burglary as well as the drug trafficking, and in fact did. That's what the other... I got to tell you that the DVR bothers me, and maybe you can make me feel better, and it's all along the way. You seize the DVR, without the warrant, or the government did, not you personally, obviously, without a warrant, and then it sits in a locker for several days. You finally do get a warrant, and then you have the hashtags end up changing, or whatever they're called. And there's evidence that the officers were rifling through the drawers and exceeding the scope of a protective suite. I know nothing was found, but all of this leads me to believe this was a little fishy. Your honor, can I start from the back end of your question? As far as the rifling through the doors, the only testimony in that regard was that a microwave was open and a drawer was open, and contrary to defense counsel's assertion, the testimony is actually that that did not happen during the protective sweep. That was after, when the officers were in the process of seizing the evidence. The video didn't show that? I thought one of the videos showed them rifling through a drawer. It does, but that's after the protective sweep. Okay. So the evidence was found during the protective sweep. They still can't do that absent the warrant, right? Could they open a drawer? Correct, your honor, they could not do that, but there was no evidence found in that drawer. There's not a single piece of evidence that was found that was not first observed in plain view. Did the defense challenge the seizure of the DVR? No. Okay, well, that makes... Except, well, they challenged it to the extent that they was illegal, and that so they could not have entered the resident. There were no exigent circumstances. They concede today that it was legal. Correct. However, if you look at the reply briefs in this case, they actually call it an illegal entry, and they suggest that, in fact, maybe there hadn't been a burglary that occurred, and they accused the officers of lying in their testimony about their guns being drawn. If you look at the DVR footage, and in fact, the district court did, and so did the magistrate judge in this case, in the photographs, that's just incorrect. In the district court, to address the credibility determination, the district court was in the best position to make that determination, and this will go back to your question regarding the defense witness and the government's expert on the DVR footage and what had and had not been changed, and those credibility determinations are almost never, as this court has held, clear error for that very reason, because they are in the better position to make that determination. As far as the DVR, there's a lot to clear up here, and I will say that the defense counsel during those two hearings just prior to the trial did a good job, or at least attempted to really muddy the waters on that issue, but the actual evidence... In fact, if you look at the defense witness's testimony, they say, he says, I have no evidence, he admits, I have no evidence that any video footage was deleted, manipulated, or altered. That is the actual evidence, so here's what happened. The DVR, this was in the evening, I believe on the 15th, the DVR was seized. It was taken, the police officer put in his locker until he was able to obtain a search warrant because he testified, we do not take it to the cybercrimes unit until we have a search warrant. Once he obtains a search warrant, I believe it's... He received it on the 23rd, the government expert who actually copied it and who examined it. He received it on the 23rd of June, so I believe that's eight days that had expired. When he received it, he made, at that time, a pristine copy of the hard drive. He then looked at the logs on the hard drive, and the log showed that from the time that DVR had been unplugged in the defendant's residence until the time he made a pristine copy, that DVR had not been accessed at all. It had not been turned on. It had not been manipulated. That would have been logged. It would have shown up on the logs on the DVR, and on the pristine copy, the copy of the original hard drive, it showed that it had not been accessed, so from that time period, there could not have been any police or United States Attorney's Office, because we were accused as well, any manipulation of that whatsoever. Well, the thing that kind of concerns me, and I don't think the opposing counsel raises the right claim, but the thing that concerns me is the instance in which the DVR is seized without a warrant. It sits in somebody's locker. Maybe the officers know that they exceeded the scope of a protective suite. Maybe they did something a little fishy, and the officers are corrupt, and so they delete part of the DVR and cover it. I'm not suggesting that happened here, but the rule we're going to write in the opinion presumably is going to cover that situation as well, and so I want to be sure that we're cognizant of that. Well, I would say that goes to the La La Land comment. This is all speculation that these officers did anything. In fact, it's just the defendants. All of this started, every bit of this argument started because the Assistant United States Attorney on this case in the very beginning, it may have been the first, actually I think it was the second lawyer to represent the defendant. He told him, look, we don't know what happened. The video that is missing is video of the burglars actually inside the residence. We have video of the burglars approaching and entering the residence, or you can see them stepping, climbing, or stepping through the front door, but you don't have video of them inside the residence. We don't know why that is. It cannot, and it's the evidence proved, it cannot be attributed to the United States or the government, the police officers either. What we do have, though, is all of the video footage of the police officers inside the residence, so that's how this all started. The speculation that the police department deleted it or manipulated it or whatever that is, it's just speculation. I don't disagree with you. It's speculation, but here's the thing. I think that if this had actually happened, where they had deleted evidence, I'm not so sure it would look all that much different than the record before. So you may well be right. I'm just trying to, I'm trying to be prophylactic here and figure out what rule makes sense to protect from the instance in which it may look like it's la-la land, but it actually happened. Well, and that's what the district court did. So when, I believe it was Mr. Sims, raised these allegations, which was pretty late in the trial, or in the pending litigation, when he raised these allegations, he gave them, he gave the defense opportunities to prove that up, show me, give me evidence of police misconduct, and he had two hearings on that. In the first hearing, he made both credibility findings, and in fact, if you look at the record, I think he was a little frustrated because it was, again, it was just speculation. There was no evidence. In fact, the defense witness said, I have no evidence that any video has been deleted. At that time, the defendant had instructed his witness not to look at the original hard drive. So, and that's something I need to address about the United States withholding or delaying disclosure of that, but he's the one that told the defense witness, don't go look at the original DVR. The judge was frustrated by that, said, I'm going to push the trial again. You've got three days to go look at it. Write me another report, and we'll come back here and talk about it. They had yet another hearing, and again, at the conclusion of that hearing, where the defense witness testified again, and the government put on Detective Bain, their expert, the judge made the finding that there's still no evidence of any deletion, manipulation, corruption on the part of the United States Attorney's Office or the police department. With respect to the hash values, it's really, that's, it's a great argument for the defense to make because it makes it look like something has been altered, right? But when you look at Detective Bain's, and even the defense witness agreed to this, when you look at the testimony about hash values, and I'm not a computer person, but I do understand this. Anytime you turn on a device, a hard drive, if you access it in any way, and you turn it on, it's going to change that hash value. And we know in this case that the hard drive was turned on. In fact, it was turned on. Initially, right at the scene, that's when it was turned on. No. No. Okay. That's incorrect. Actually, it was already on. They did not turn on the hard drive. They didn't do anything to the hard drive instead of unplug it. Now, the defense tried to argue that somebody has a remote control in their hand, and a still photograph, and that they were accessing it. The testimony about that was that the United States put on a rebuttal witness, and the testimony was, actually, we tried to turn on, we turned on the TV, and it was a basketball game that was on. In fact, we couldn't. We didn't know how to access the DVR. So, they actually did not, and the government's manipulated. Now, what's important to note is the hash values for each of the video files had not changed. And the defense witness admitted that, that for each video file on that hard drive, the hash values remain the same from the pristine copy in every single copy that was made for the defense. So, yes, the overall hash value is going to change. You turn that hard drive on, it's going to change. As the expert said, you make a text file on that hard drive that says, I think his example was, I love Diet Coke, that's going to change the overall hash value. You delete the E on that Diet Coke, it's going to change the hash value again. The overall hash value, that's a non-issue. The issue is whether the video files themselves were deleted, or the hashtag for those video files was changed, and it had not been. And did the district court made a viewpoint, and probably the case law would support you, that it's clear air. So, the district court gets to make that decision, and we need to defer to that determination. Under the court's precedent, that's almost, it's almost never challenged, yes. As far as the United, I want to address this. As far as the United States withholding or delaying the access to the DVR footage, the DVR footage was made available, and if the court looks at the record, right up front. In fact, the discovery, the assistant United States attorney did a very good job here. Every one of his discovery letters, he filed with the court, so they are part of the record. And he tells the defense, here's what I'm handing over, here's the DVR footage, here's more of the DVR footage, because we've got footage going months, you know, for three months prior to this of drug trafficking. If you want to come and inspect it, it is available to you. Now, the problem with Mr. Sims was, he was the fifth attorney, and so he was not privy to all of the conversations prior to that, that had been recorded during the status conferences. There are status conferences where the United States, prior to Mr. Sims representing him, where the United States says, hey, we've told the defense that they can come look at the hard drive. I believe Mr. Zotos was going to do that, but his expert said she couldn't, so he had to get a new expert. The fact that they didn't look at the original hard drive until the week before trial had nothing to do with the United States, and everything to do with the defendant himself, and the fact that he had five lawyers leading up to trial. Quick question. I think you've answered this before, but I just want to be clear. Was there a challenge before the district court to the seizure of the DVR? The actual seizure itself. The challenge was not that it was not obviously incriminating. The challenge was they shouldn't have been in the house, that none of the evidence was observed in plain view. The other evidence was challenged on different grounds. In other words, they should not have moved a dresser when they were doing their protective sweep, and that was, of course, denied by the magistrate court. But it was not, on the ground that you raise now, it was not challenged. Thank you. Mr. Robinson, I'll give you a couple minutes on rebuttal. Excuse me. Thank you, Your Honors. Well, with respect to, just to address a few of the government's points real quickly, certainly there was a... Can you address mine first, though? The seizure of the DVR... There was a challenge made that it couldn't be seized on the grounds that it wasn't plainly incriminating. There was not a specific challenge on that... We're using that exact language, Your Honor. There was a motion to suppress file. The motion to suppress included... It was more like a shotgun-type motion. It was asking that everything be suppressed. Didn't specifically go into the details of the DVR hard drive and why that information wasn't facially incriminating. And would it be fair to say that you have not really raised that argument on appeal as well? Well, I'm afraid the raised the arguments that were available on the record below. But however... And that's not one of them. Well, if we're going to parse it into a very specific pigeonhole, yeah. That's not exactly what I've raised. We've raised that the motion to suppress should have been granted, including and up to the DVR evidence. However, Your Honor, it is correct. Now, with respect to the DVR evidence itself, my recollection is, from the record, is that yes, the government certainly was making the original available to the defense if they could come in and view it at the U.S. Attorney's Office, I'm assuming. However, this was... The specific request was made later on into the case in the pre-trial stages. I believe that the first copy that was made available, clone copy that was made available to the defense expert at the time, was not a copy that could be viewed by the defense. It was in a format that was not accessible. And later, they were able to obtain that DVR evidence. And certainly, the judge had a reason to be aggravated with the delays in the defense and everything else that was going on in the case. However, that should have had no impact on the defendant's request that he represent himself at this trial, because it was clear from the context that it was not made for purposes of delay at that point, and he was ready for trial. With that, we would ask this court to please vacate Mr. Williams' convictions and sentences. Thank you very much. Very well. Thank you, Mr. Robinson. Court appreciates your arguments and briefing. The case is submitted and will be decided in due course.